In the Matter of LOOMIS BURRELL et al., as Trustees of BURRELL INVESTMENT TRUST, Petitioners, against THOMAS H. LYNCH et al., Constituting the State Tax Commission, Respondents.

Third Department, November 10, 1948.

*Bronner & Ward* (*James C. Bronner* of counsel), for petitioners.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, Solicitor-General* and *Henry S. Manley, Assistant Attorney-General,* of counsel), for respondents.

FOSTER, J. This is a certiorari proceeding to review a determination of the State Tax Commission which held that the Burrell Investment Trust was taxable under article 9-A of the Tax Law for a period of eleven years, ending December 31, 1931. The tax assessed amounted to $23,086.13. Although the determination of the tax commission was made in 1934 the matter has only now reached this court for review.

The tax assessed was a franchise tax imposed by section 209 of the Tax Law upon every domestic corporation and computed upon the basis of net income. Prior to 1922, section 208 of the Taw Law defined a corporation as including a joint stock company or association, but it did not include a common-law trust. On March 30, 1922, the definition of a corporation was enlarged by an amendment which added the following language to section 208 of the Tax Law (L. 1922, ch. 376): " The term ' corporation ' includes a joint-stock company or association and any business conducted by a trustee or trustees wherein interest or ownership is evidenced by certificate or other written instrument ".

Undoubtedly the purpose of the amendment was to remove the immunity from corporate taxation which many groups had enjoyed by doing business under the form of a common-law trust. And unquestionably it was hastened by the decision of a Federal court, made a short time before, wherein it was held that such a trust was immune from taxation under the Federal Revenue Act (*Hecht* v. *Malley,* 276 F. 830).

The issue before the tax commission and now before us is whether the Burrell Investment Trust conducted any business by trustees wherein interest or ownership was evidenced by certificate or other written instrument. It is the contention of petitioners that they were not conducting a business, but merely investing and reinvesting trust funds, and collecting and distributing income as in an ordinary trust.

The Burrell Investment Trust was created by members of the Burrell family. From 1893 to 1920, certain members of the family pooled their funds for investment purposes, and the pool was operated for them by Loomis Burrell and David H. Burrell, Jr., who acted pursuant to an oral understanding and

under a power of attorney. As of January 1, 1921, they created the trust mentioned to take the place of the pool. Their reasons for establishing a trust were substantially as follows. The pool had then reached a value in mortgages, notes, land contracts and other assets, of $954,300. These assets could not be conveniently divided and there was no written agreement to show the proportionate ownership thereof. Also most of the securities were held in the names of those who were operating the pool. Another reason for the change was an expected increase in facility and efficiency of management.

Accordingly the trust agreement was executed by those six members of the family whose interests had previously been pooled. Their interests were transferred to Loomis Burrell and David H. Burrell, Jr., the same members who had managed the pool, in trust to hold and manage, dispose of and deal with, and to receive and pay over the net income therefrom. The duration of the trust was to be for the lives of the original trustees or the survivor of them, with provisions for the selection of successor trustees in the case of death or resignation. The beneficial interests of the shareholders in the trust were to be divided into shares, and the agreement provided that every shareholder was entitled to receive a certificate, in a form prescribed, specifying respectively the number of shares held by such shareholder.

The oral proof taken before the commission indicates that certificates were drawn and held by the trustees, and were never delivered to the shareholders.

The trust agreement gave to the trustees extensive powers to deal with the principal of the trust, powers so broad indeed that the exercise of them in whole, or even in a great measure, would have attested the conduct of a business rather than the mere investment of principal and the collection and distribution of income. But the record gives no support to a finding that such broad powers were ever employed by the trustees. They conducted the trust generally in the same manner as they had administered the pool before the creation of the trust. The original securities were held, and the income collected and distributed each month. Securities were generally held until maturity, and in the eleven-year period there were only twenty instances where securities were sold before maturity, and then not for speculative purposes. During the same period there were sixty-five bond purchases and no sales during the first seven years. From 1928 to 1931 there were fifteen transactions by which bonds were sold, and those were sales of real estate bonds

which were sold at a loss. There were only two stock sales during the period in question and those took place in 1930 and 1931, which were depression years. It does appear that mortgage loans were made by the trustees, in fact forty-seven such transactions are shown; but there is no basis in the proof to support a charge that the trustees were engaged in the business of buying and selling mortgages. Manifestly those transactions comprised the investment and reinvestment of principal for the purpose of obtaining income, and the same may be said of other transactions in securities which are not detailed here. There were no mortgages sold to outsiders during the tax period. Some loans were made without security, presumably on notes, but only seven of those in small amounts, were made to outsiders. They were also investments similar to those which had been made during the operation of the pool.

Profits from the sale of any securities were negligible. The total amount invested when the trustees took over from the pool on January 1, 1921, was $954,300. The amount invested as of December 31, 1931, was $1,034,400, but during the eleven-year period there had been additional contributions by the beneficiaries in an amount of over $80,000.

The foregoing brief outline does not indicate the conduct of a business in buying and selling securities for speculative profits. To the contrary it depicts nothing more than the trust management of property for income purposes, with the exercise of incidental powers to change investments and reinvest funds realized from the sale of securities. This conclusion is further confirmed by the fact that under the terms of agreement the trustees were to be allowed compensation only to the extent of commissions allowed to testamentary trustees under the laws of the State of New York; and even this compensation the trustees waived, thus indicating the family nature of the trust and the fact that it was not conducted as a business. The trust had no business office, and it had no regular employees. The private secretaries of one of the trustees kept its books and attended to the collections and distribution of income. His salary, for part time work, ranged from $75 to $125 a month, and was paid from trust funds. The trust employed no agents to solicit or conduct business and it owned no property of any kind except the funds comprising its principal. It was strictly a private family affair and its shares were not available for purchase by the public.

The facts we have stated are not in dispute, or at least there is not any substantial evidence in the record made before the

commission to warrant findings to the contrary. There remains the query of whether the commission could have justly and properly drawn an inference that the trustees were conducting a business within the meaning of the statute. So far as ownership of shares in trust being evidenced by certificates is concerned we think that the trust came within the language of the statute. Certificates were drawn, and the fact they were held by the trustees and not delivered to shareholders we regard as inconsequential. Ownership was evidenced by them.

But the issue as to whether the trustees were engaged in business is a different matter. The term " business " in general speech is very comprehensive and would include every conceivable transaction relating to property and property rights. But in the construction of tax statutes its meaning has been limited to connote something more than the mere investment of funds and the collection of income therefrom, with the incidental replacement of securities and the reinvestment of funds that constitute the corpus, as in the case of an ordinary trust (*Matter of City Bank Farmers Trust Co.* v. *Graves,* 272 N. Y. 1; *People ex rel. Nauss* v. *Graves,* 283 N. Y. 383; *People ex rel. Voelkel* v. *Browne,* 268 App. Div. 596, affd. 294 N. Y. 834; *People ex rel. Merrill* v. *Gilchrist,* 212 App. Div. 763). The fact that most of the cases dealing with this subject have to do with individuals does not alter the principle involved.

Respondents have cited several cases where investment trusts were held taxable under article 9-A of the Tax Law before the term " investment trust " was defined by the amendment to the statute in 1938 (§ 208, subd. 4; L. 1938, ch. 201). But those cases did not involve family trusts where the main purpose of the trusteeship was to manage a fund for income purposes alone. The City Bank Farmers Trust Company case (*supra*) is also cited by respondents as a controlling authority here. In that case however the proof revealed, and it was practically conceded, that the taxpayer was engaged in the business of buying and selling securities. Contentions otherwise urged were that because the entire management of the business was delegated to the trustee without any right of substitution or control of its actions, and because the certificates were transferable only in a limited way, the trust was not an entity which came within the purview of article 9-A of the Tax Law. Those contentions were rejected but the decision on those issues is not decisive here where a different state of facts is presented and the issue is whether a business was conducted. The same may be said of the decision in the *Guaranty Trust Company* case. There the trustee was

actually engaged in dealing in securities for profit (*People ex rel. Guaranty Trust Co.* v. *Lynch,* 241 App. Div. 638, affd. 265 N. Y. 593).

On the undisputed facts presented in this review we can find no sound reason for departing from the rule ordinarily applied that the mere investment of funds and the collection of income therefrom does not constitute a business.

There is another feature of the case which may not be overlooked. It has been urged that the form of the trust agreement, particularly the powers given to the trustees which would permit them to engage in business, is of vital significance. Doubtless this fact should be given weight but we do not deem it controlling. The actual activities of the trustees are, we think, the decisive factor. It is against such activities that the tax is imposed, and if they did not constitute the conduct of business within the meaning of the Tax Law a franchise tax was not properly imposed. The test of the trustees' activities is that which they actually did, not what they might have done (*Matter of City Bank Farmers Trust Co.* v. *Graves* (*supra*); *People ex rel. Goodwin Sand & Gravel Co.* v. *Law,* 207 App. Div. 567; *City Bank Farmers Trust Co.* v. *Helvering,* 313 U. S. 121). Such a test necessarily follows the fact that a tax was imposed by the statute upon net income realized from the conduct of a business. If there was no business, then irrespective of power, there was nothing to tax.

In conformity with the views we have stated we reach the conclusion that the determination of the State Tax Commission was erroneous as a matter of law and should be annulled with $50 costs and disbursements.

HILL, P. J., BREWSTER, RUSSELL and DEYO, JJ., concur.

Determination of the State Tax Commission annulled on the law and facts, with $50 costs and disbursements. [See *post,* pp. 1017, 1083.]